935 F.2d 269
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Oliver H. DANIEL, Individually, Oliver H. Daniel, Trustee of
the Matthew G. Daniel Trust, the Paul C. Daniel
Trust, and the David O. Daniel Trust and
the Caulfield Corporation,
Plaintiff-Appellant
v.
The OHIO CASUALTY INSURANCE CO., a for profit Ohio
Corporation, CS & I Insurance Services, Inc., a Kentucky
Corporation, Paul Napier, Owen C. Rouse, Jr., Orville Huff,
Orlis Huff, Charlotte Huff, Orville Huff & Orliss Huff, as
principals, partners, owners, agents, or doing business as
Irish Hill Farm, Ltd., a Kentucky Limited Partnership, David
Russell Marshall, George Gregory, McBrayer, McGinnis, Leslie
& Kirkland, Richard M. Compton, Defendants-Appellees
 No. 90-5806.
 United States Court of Appeals, Sixth Circuit.
 June 4, 1991.
 
 Before MERRITT, Chief Judge, and ALAN E. NORRIS and SUHRHEINRICH, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Plaintiffs appeal the District Court's grant of summary judgment as to certain defendants in this diversity action for fraudulent inducement in connection with plaintiffs' sale of land to the Commonwealth of Kentucky. We affirm.
 
 BACKGROUND
 
 2
 Plaintiffs owned a 74.95 acre farm in Scott County, Kentucky. On December 5, 1984, they leased it for a term of two years to defendants Orville and Orliss Huff. The lease contained an option clause, whereby the Huffs could purchase the leased land for $650,000 so long as they exercised the option within ten days prior to the expiration of the lease. The lease also required the Huffs to maintain a general public liability insurance policy for the leased premises "in amounts not less than $500,000 in respect to injury or wrongful death to any one person [and] to the limit of not less than $300,000 in respect to any one accident." Defendants who are appellees in this appeal include David Marshall (the Huff's attorney), and Paul Napier and CS & I Insurance Services (the insurance agent and local insurer, respectively) which insured the Huffs' leased property through respondent Ohio Casualty Insurance Company (Ohio Casualty").
 
 
 3
 Approximately half-way through the lease, the Toyota Corporation announced its plan to locate a large manufacturing plant near the leased property, which caused the property to appreciate greatly. The Huffs (through their attorney, Marshall) informed plaintiffs that they wished to exercise the option to purchase the farm. Plaintiffs relayed to the Huffs that they would honor the option if the Huffs had fulfilled the conditions of the lease, especially the insurance provisions. Marshall learned through Paul Napier, the Huffs' agent at CS & I, that the Huffs only had $250,000 coverage per occurrence for the property, in contradiction to the amount stipulated in the lease.
 
 
 4
 The following incident, which provides the basis for plaintiffs' fraudulent inducement claim, occurred in response to the Huffs' realization that they did not have adequate coverage under the terms of the lease. Napier told Ohio Casualty that the Huffs feared that this discrepancy in coverage might prevent them from exercising the option. Although the record is not entirely clear as to whether the Huffs had failed to request sufficient coverage limits or whether Ohio Casualty and/or its agent made a mistake in writing the policy to meet the Huffs' needs, Ohio Casualty agreed to increase retroactively (for 1985) and prospectively (for the 1986 policy) the coverage to $500,000. Although neither Ohio Casualty nor the Huffs knew of any accident which had occurred on the leased premises in 1985, defendants assert that the retroactive increase was legitimate because the statute of limitations had not run on any potential claims for accidents which might have occurred during that period (i.e., if someone claimed he was injured on the Huffs' leasehold during 1985, the liability limit would be $500,000, not $200,000). Pursuant to plaintiffs' request, Marshall showed the 1986 policy with its $500,000 coverage to plaintiffs. When asked about 1985 coverage, Marshall gave plaintiffs a copy of a letter from Napier, dated January 27, 1986, which stated
 
 
 5
 The above mentioned policy provides farm liability and employees' medical payments. The limits of liability are $500,000 each occurrence on bodily injury and $100,000 each occurrence for property damage. This is a renewal policy and the premium has been paid on this policy as well as on the previous policy.
 
 
 6
 (emphasis added).
 
 
 7
 Despite being shown these insurance documents, plaintiffs refused to honor the option. Plaintiff Caulfield Corporation filed a quiet title action in state court challenging the Huffs' option (Caulfield Corp. held record title to the property; however, the lease containing the option to purchase was signed by Daniel, the owner of Caulfield Corp.). Shortly thereafter, the Commonwealth of Kentucky initiated a condemnation action against plaintiffs and the Huffs in regard to a part of the property that was urgently needed for an access road for the Toyota plant. While these cases were pending, the Huffs and plaintiffs reached an agreement with the Commonwealth of Kentucky whereby plaintiffs sold the property to the Commonwealth for $1.5 million. Plaintiffs in turn were required by the agreement to pay $550,000 to the Huffs and $30,000 for attorneys' fees. In effect, plaintiffs realized almost $300,000 more than they would have received under the terms of the option agreement.
 
 
 8
 The District Court rejected plaintiffs' argument that defendants fraudulently induced them to sell the property to the Commonwealth and to pay $550,000 to the Huffs. Basically, the District Court held that, under Kentucky law, plaintiffs could not refuse to honor the option even if defendants had violated the insurance covenant. Furthermore, it ruled that plaintiffs were getting ahead of themselves in stating that the Huffs could not enforce the option because of their alleged fraudulent activity. The District Court stated that the equitable issue of unclean hands/specific performance is never reached because the Huffs had a legal right to enforce the option agreement under Kentucky law. The District Court dismissed the claim against Marshall and granted summary judgment in favor of all other defendants.
 
 ANALYSIS
 
 9
 Plaintiffs strenuously maintain that this suit is for fraud in the inducement, not an action for cancellation of the option. Analyzing the requirements of fraud in Kentucky, we find several bases for upholding the District Court's decision. Kentucky law requires a plaintiff to prove by clear and convincing evidence six elements in order to establish fraud. There must be:
 
 
 10
 (a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury.
 
 
 11
 Wahba v. Don Corlett Motors, Inc., 573 S.W.2d 357, 359 (Ky.Ct.App.1978) (citing Crescent Grocery Co. v. Vick, 194 Ky. 727, 240 S.W. 388 (1922)). "Actual fraud ... consists in successful deception intentionally practiced to induce another to part with property or some legal right." Boatwright v. Walker, 715 S.W.2d 237, 243 (Ky.Ct.App.1986) (citation omitted). The District Court did not err in granting summary judgment for defendants or in dismissing the complaint as to defendant Marshall.
 
 I. NO COMPENSABLE INJURY
 
 12
 In rejecting plaintiffs' claims, the District Court found most persuasive defendants' contention that plaintiffs can point to no injury they suffered as a result of defendants' alleged misrepresentation regarding the insurance coverage. We agree. Kentucky's highest court has spoken clearly on this matter. In Allen v. Bates, 498 S.W.2d 120, 121 (Ky.1973), the Court ruled that, despite lessees' breach of the covenant to pay rent, the lessees could still exercise an option to purchase contained in the lease. It reasoned that the acceptance of late rental payments by the lessor "constitutes a waiver of the lessees' breach" and therefore the entire lease agreement (including the option to sell) continues in "full force and effect." The Court in Allen expressed the general rule of law that "in the absence of an express provision for forfeiture in the lease[,] a breach of a covenant ... does not work a forfeiture of an option to purchase." Id. In general, the Court "look[s] upon with disfavor" such a forfeiture provision and will "strictly construe [its terms] against the party seeking to invoke them." Id. 121-22.
 
 
 13
 The Huff-Daniel lease contained no forfeiture clause. Thus, under Kentucky law, the breach of the insurance covenant did not result in an automatic forfeiture of the option to purchase. The record reveals that defendants accepted rent from the Huffs, despite the Huff's alleged violation of the terms of the insurance covenant, at least until the time the Huffs notified defendants of their intent to exercise the option. Following Allen, we find that defendants' acceptance of rent without protest "constitutes a waiver" of any alleged breach of the insurance covenant that might have been committed by the Huffs. Given the validity of the option, plaintiffs would be entitled to only $650,000 under the terms of the option. Instead, plaintiffs already have received almost $950,000 for their property. Clearly, under our interpretation of Kentucky law, plaintiffs have not been injured or suffered any damages.
 
 
 14
 However, plaintiffs contend that Kentucky law requires a contrary result, citing West Kentucky Coal Co. v. Nourse, 320 S.W.2d 311 (Ky.1959). The Court in Norse denied specific performance of an option agreement to convey mining rights to a coal company which was putatively entered into by an uneducated and illiterate seventy-seven year old man. One basis the Court enumerates for upholding the lower court's refusal to give specific performance is that the coal company did not fulfill its reciprocal obligations to provide the man with information regarding the preliminary mineral findings. Id. at 315. Plaintiffs argue that this holding should be interpreted to mean that Kentucky courts will not enforce options to purchase where the person seeking to enforce the option has not complied with all provisions of the agreement (i.e., in this case, keeping the property adequately insured).
 
 
 15
 We disagree with plaintiffs' interpretation of Nourse. Reviewing on an arbitrary and capricious standard, the Nourse court found the above-mentioned factor only one factor among many for which it upheld the lower court's refusal to grant specific performance. Clearly, the more important factors in the court's decision were the "harsh, oppressive[, and] inequitable" terms of the option agreement, the uneven bargaining position of the parties, and the fact that the lower court credited as true Mr. Nourse's testimony that he did not understand the option contract. Id. Furthermore, Nourse only speaks to the coal company's equitable remedies. Presumably, the coal company could have sought legal remedies against Mr. Nourse. Accordingly, even if this case could be construed to hold that a person with "unclean hands" could not obtain specific performance, it does not necessarily mean that damages would also be unavailable.
 
 
 16
 Following this theory, even if the Huffs would not have been entitled to specific performance (assuming arguendo that their activity regarding the insurance policy constituted "unclean hands"), plaintiffs cannot prove any arising injury from the alleged fraudulent inducement. Allen clearly holds that a lease with an option to purchase provision remains valid even where party seeking to enforce the option has earlier been in default on the payment of rent, but has corrected the breach by late payment. In this case, the Huffs arguably had breached a much less important provision (the record reveals that plaintiffs had not even asked whether the Huffs had the property properly insured prior to the Toyota announcement). Furthermore, as in Allen, the Huffs corrected their breach (by increasing coverage for the leased property for all required years) before seeking to exercise the option. See Restatement (Second) of Property Sec. 13.1 comment d (1976) (stating that landlord is entitled to terminate lease based on tenant's breach of promise to keep leased property insured, only if "tenant does not procure the insurance within a reasonable time after being requested to do so").
 
 
 17
 Because the option agreement was valid, even if equitable remedies were not available to the Huffs, the alleged fraudulent inducement caused plaintiffs no damages. The Huffs would have been entitled to damages at law equal to the market price of the property minus the option price. Taking this into consideration, plaintiffs' contentions that (1) the alleged fraudulent inducement caused them to sell the property to the Commonwealth of Kentucky for too little money and that (2) plaintiffs would not have paid the Huffs $550,000 are erroneous. At law (given the validity of the option agreement), plaintiffs would owe the Huffs approximately $550,000, calculated by subtracting the option price ($650,000) from the market price ($1.5 million). If the market price were higher as plaintiffs argue, they simply would have owed the Huffs more money.
 
 II. NO MISREPRESENTATION MADE
 
 18
 We find that the lack of damages supports the District Court's judgment. However, as an alternate basis for upholding the District Court's opinion, it appears that defendants made no misrepresentation to plaintiffs regarding the insurance coverage. Plaintiffs concede that the insurance policy provided $500,000 per person coverage for 1986, as well as for any injuries that had occurred on the leased land in 1985 but for which a claim had not yet been filed. However, they nonetheless contend that the statement contained in Napier's letter of 1/27/86 regarding coverage for 1985 was purposefully misleading.[1] On the contrary, we think that everything told plaintiffs was literally true.
 
 
 19
 Alternatively, plaintiffs argue that representation stating the literal truth can nonetheless constitute a fraudulent misrepresentation. See Restatement (Second) of Torts Sec. 529 (1976) ("representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation"). However, while agreeing with this general proposition, we find that plaintiffs' argument is flawed. Under Kentucky law, plaintiffs were entitled to no additional, qualifying information. Plaintiffs could only cancel the lease (and purchase option) if, when asked, the Huffs failed to increase the insurance coverage to the level specified in the lease agreement. From this perspective, the statements in the Napier letter clearly communicate what plaintiffs needed to know; that is, whether the insurance coverage levels at that time were being properly maintained.
 
 
 20
 Accordingly, the District Court's grant of summary judgment/dismissal is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 This letter stated, among other things, that for the 1986 policy "[t]he limits of liability [were] $550,000 each occurrence...." and that the 1986 policy was "a renewal policy and the premium ha[d] been paid on [it] as well as the previous policy